# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 24-0823V

|  |  |
|---|---|
| CLAIRE FORCHHEIMER,<br><br>                  Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                  Respondent. | Chief Special Master Corcoran<br><br>Filed: October 1, 2025 |

*Jonathan Joseph Svitak, Shannon Law Group, P.C., Woodridge, IL,* for Petitioner.

*Tyler King, U.S. Department of Justice, Washington, DC,* for Respondent.

## FINDINGS OF FACT[1]

On May 28, 2024, Claire Forchheimer filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that that she suffered a Table shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccine received on December 19, 2022. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Fact Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Fact Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons discussed below, I find that Petitioner likely suffered the residual effects of her condition for more than six months, and that the onset of her shoulder pain likely began within 48 hours of vaccination.

## I. Procedural History

On November 6, 2024, Respondent filed a status report stating that he was amenable to informal resolution of this SIRVA claim, and the parties negotiated (ECF Nos. 12-20). However, they soon reached an impasse (ECF No. 21).

Respondent filed a Rule 4(c) Report objecting to compensation on two grounds (ECF No. 23). First, Respondent argues that Petitioner had not established that she experienced residual effects for more than six months, noting that she treated her injury until April 4, 2023 (less than four months after vaccination), and did not seek treatment again until five months later. Rule 4 Report at *5. Respondent also asserts that Petitioner's delay in seeking care until 45 days after vaccination, coupled with the record of that visit noting that her pain began "4 days or so" after vaccination, prevents her from establishing that her pain began within 48 hours after vaccination. *Id.* at *6.

## II. Relevant Evidence

### A. Medical Records

Petitioner received the vaccine alleged as causal in her left deltoid on December 19, 2022. Ex. 2 at 368. Forty-five days later, on February 2, 2023, Petitioner had a video appointment with Dr. Rujeko Nyachoto for left shoulder pain. *Id.* at 378. Petitioner explained that she had received a flu vaccine on December 20th,[3] and had "stiffness since then." *Id.* The record further states that it "[w]as 4 days or so after that the soreness was noticed." *Id.* After a shoulder x-ray came back normal, Dr. Nyachoto referred Petitioner to a sports medicine specialist the following week. *Id.* at 395.

On February 23, 2023, Petitioner saw sports medicine physician assistant ("PA") Joseph Gomez for left shoulder pain. Ex. 2 at 397. The record of this visit states that her pain started on December 19, 2022, and the injury is listed as "[f]lu shot." *Id.* Her pain was three out of ten and worse with activity. *Id.* at 397-98. On examination, her left shoulder active range of motion in abduction was 150 degrees (compared to 170 degrees on the right side). *Id.* at 399. In all other measurements, her left shoulder range of motion was identical to her right shoulder. Id. The record stated that Petitioner would be moving to

---

[3] Petitioner actually received the vaccine on December 19th, as noted. Either Petitioner incorrectly recalled the date, or the provider incorrectly recorded it. In any event, Petitioner related her pain to vaccination, and this minor discrepancy does not affect my ruling herein.

New York in April. *Id.* PA Gomez explained that her symptoms could be related to SIRVA, overuse, or a rotator cuff strain. *Id.* at 400. He recommended physical therapy ("PT"), anti-inflammatory medication, and activity modification. *Id.* He added that if the symptoms persisted, she could consider a cortisone injection in the future. *Id.*

The following month (March 20, 2023), Petitioner underwent a PT evaluation. Ex. 2 at 411. She reported a three-month history of left shoulder pain following a flu vaccine in December, explaining that "[s]hortly after the vaccine, she developed intractable shoulder pain." *Id.* At the present time, she had pain with end-range motion overhead. *Id.* On examination, her shoulder range of motion was within normal limits except that she had painful end-range flexion and abduction. *Id.* at 412. She had not been exercising due to the pain, and wanted to know if her symptoms were permanent. *Id.* The therapist noted that she had signs and symptoms consistent with possible Parsonage-Turner syndrome, neuralgic amyotrophy, or subacromial pain syndrome. *Id.*

On March 24, 2023, Petitioner saw neurologist Dr. Nicholas Parziale. Ex. 2 at 418. Dr. Parziale performed an EMG, which was normal, showing no electrodiagnostic evidence of left brachial plexopathy. *Id.* at 420. PA Gomez then ordered an MRI, which showed trace subacromial/subdeltoid bursitis, with no abnormality of the deltoid musculature. *Id.* at 423.

Petitioner attended a second PT session on April 4, 2023. Ex. 2 at 428. The record indicates that she reported "status quo," which I interpret to mean that her symptoms were largely unchanged from her evaluation a couple of weeks earlier. *Id.* at 429. The exercises were not worsening her pain, although she did feel fatigue and weakness in her left shoulder. *Id.* She was considering a steroid injection. *Id.* Her shoulder range of motion was within normal limits except for painful end-range flexion and abduction. *Id.* at 430. She had positive results on the Neer's impingement test and a scapular test, which the therapist stated was "suggestive of decreased neuromuscular control of scapular stabilizers." *Id.*

Petitioner did not seek treatment for her shoulder again until six months later, on September 25, 2023, when she underwent a PT evaluation. Ex. 5 at 3. The record from this evaluation lists an injury date of December 19, 2022 (the date of vaccination). *Id.* She stated that after a flu vaccination in December she began having left shoulder pain. *Id.* She had some testing and was given exercises in PT, which helped. *Id.* She now wanted a second opinion, explaining that during the summer she was using her left arm to catch a ball and "it flared up again to 3/10 but constant pain. L Shoulder feels better since then but wants to get it checked out." *Id.* At present, she did not have any left shoulder pain, but she was avoiding upper extremity workouts at the gym to avoid flare ups. *Id.* On examination, her shoulder range of motion was within normal limits, without pain. *Id.* She had mild pain with left shoulder empty can testing and mild tenderness upon palpation to

her left deltoid. *Id.* at 4. Although additional PT was recommended, it appears that Petitioner did not pursue further treatment.

### B.     Testimonial and Other Evidence

Petitioner filed two declarations in support of her claim.[4] Exs. 1, 6. She states that the vaccine was administered higher on her arm than she is used to, and she felt "immediate pain" at a level of three out of ten after vaccination. Ex. 1 at ¶ 5. She describes it as a stinging pain, with some burning and stiffness. *Id.* Later that day on a plane, she needed help putting her carry-on luggage into the overhead bin. *Id.* Within the first 48 hours after vaccination, her pain level increased to four out of ten, with stinging and occasional sharp pain. *Id.* at ¶ 6. She had difficult lifting her arm above shoulder height and "extreme difficulty" performing workouts involving her shoulders such as pull ups, push ups, planks, holding weights, and using a rowing machine. *Id.* at ¶ 7. Sleeping was difficult, and she avoided sleeping on her left side. *Id.*

For the first four weeks, Petitioner self-treated with muscle relaxers, stretching, and ibuprofen, expecting the pain to go away with rest. Ex. 1 at ¶ 9. Instead, it worsened, so on January 13, 2023, she reached out to her doctor for an appointment. *Id.*

Petitioner was offered a steroid injection, which she declined as she was nervous to receive another injection in her injured shoulder. Ex. 1 at ¶¶ 12, 18. After her second PT appointment on April 4, 2023, she was given a home exercise program. *Id.* at ¶ 19. She states that at that time, her left shoulder remained symptomatic (although she does not detail her symptoms). Ex. 6 at ¶ 1.

Less than two weeks later, on April 15, 2023, Petitioner moved from California to New York, and thus had to discontinue her PT sessions, although she stuck with her home exercises. Ex. 1 at ¶ 20. She states that she continued to have pain and limitations with her left shoulder over the next five months. *Id.* She tried to resume activities she had enjoyed before vaccination, but was very cautions, finding that sudden movements of her left arm triggered a sharp increase in her pain. *Id.* When she slept on her left side, her left shoulder would be painful the following day. *Id.* During this time, she was also working toward establishing care with a new doctor in New York and obtaining new health insurance, which did not allow her to seek formal treatment. *Id.*

Petitioner states that she stayed in Europe for three months that summer and thus could not attend in-person appointments, and did not want to incur expenses seeing a doctor outside of the United States. Ex. 6 at ¶ 2. In early July 2023, she reached out to a PT facility asking about virtual PT sessions for her shoulder pain. *Id.* After several weeks

---

[4] Although Petitioner labeled these filings as affidavits, they are not notarized. Nonetheless, they are acceptable as declarations. 28 U.S.C. § 1746.

of communication, she was told that the facility could not accommodate virtual sessions. *Id.* Thus, she continued with her home exercises until she returned to the United States. *Id.*

On September 7, 2023, Petitioner returned to California for a visit. Ex. 1 at ¶ 21. While there, she contacted a physical therapist about her shoulder because she "was more familiar with the medical providers" there. *Id.* Thus, she saw a physical therapist in California on September 25th. *Id.* at ¶ 22. As of June 5, 2024 (when she signed her declaration), Petitioner "continue[d] to have occasional flare-ups of left shoulder pain, especially with sudden movements" or during exercise using weights. *Id.* at ¶ 23.

Petitioner has also filed Exhibit 7, which consists of email correspondence between Petitioner and a consultant with Professional Physical Therapy between July 10 and August 16, 2023. Ex. 7 at 1-4. In the correspondence, Petitioner reports that she was traveling outside of the country and wanted to "set up a virtual session with a physical therapist to follow up on a SIRVA injury (and get a second opinion)." *Id.* at 1. The Professional Physical Therapy consultant ultimately told Petitioner on August 15th that she could only be seen in person. *Id.* at 3.

### III.  Legal Standard

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has

5

"reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[5] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five-month mark).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48

---

[5] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### IV.  Finding of Fact

#### A.  Severity

Petitioner sought care until three and a half months after vaccination, followed by a nearly six-month gap in treatment. At the time of the last PT session before the treatment gap, she was still experiencing pain with end-range flexion and abduction, as well as fatigue and weakness. Her shoulder range of motion was within normal limits, and she had positive results on impingement and scapular testing. Thus, she continued to experience mild symptoms at this time.

Thereafter, she moved across the country and spent the summer outside of the United States. She attempted to obtain PT services virtually, but was unable to do so. When she returned to her prior state, she attended another PT evaluation. At that time, now nine months after vaccination, she felt some improvement, although she continued to have mild pain with testing and palpation. Thus, at this point her shoulder condition was essentially resolved.

For purposes of the statutory severity requirement, the question is when her shoulder pain resolved, and whether that occurred before mid to late June 2023. Although this cannot be ascertained with precision, I find that the evidence preponderates in favor of a finding that, more likely than not, Petitioner's shoulder pain continued until late June – although likely not much beyond that, given that when she was evaluated in September she had virtually no symptoms, and that she proposed that catching a ball that summer may have triggered a *flare up* of symptoms – suggesting that symptoms which had gone away had returned with that episode.

#### B.  Onset

The record supports the conclusion that Petitioner's shoulder pain began within 48 hours of vaccination. Although she did not seek care for 45 days, this pattern of some initial treatment delay is seen in SIRVA cases with some frequency, and does not defeat a claim when the record otherwise suggests Petitioner consistently reported an onset of less than two days, as required by the Table. *Baskin v. Sec'y of Health & Human Servs.*, No. 21-2207V, 2025 WL 1891826, at *7 (Fed. Cl. Spec. Mstr. June 2, 2025) ("treatment delay by itself does not undermine a favorable onset finding"); *Graczyk v. Sec'y of Health & Human Servs.*, No. 21-0376V, 2023 WL 4573868 (Fed. Cl. Spec. Mstr. June 16, 2023) (finding onset within 48 hours where Petitioner first sought care two months after vaccination).

Although the first treatment record states that Petitioner reported soreness "4 days or so" after vaccination, it also says that she had stiffness "since" vaccination. Ex. 2 at 378. And when she saw PA Gomez a few weeks later, she reported pain that started on December 19th – the date of vaccination. *Id.* at 397. Similarly, at her PT evaluation in March 2023, she related her pain to vaccination, stating that it began "[s]hortly after"

8

vaccination. *Id.* at 411. And her testimonial evidence describing "immediate pain" supports these records. I find that the single reference to pain beginning four days after vaccination is not sufficient to outweigh the other records that support a finding of pain within 48 hours of vaccination.

## CONCLUSION AND SCHEDULING ORDER

Petitioner suffered a mild injury, which she treated for three and a half months with two sessions of PT, in addition to an MRI and EMG testing. After a six-month gap, Petitioner attended another PT evaluation which appears to have been directed more at learning how to exercise and move safely than treatment of pain. As such, I would expect compensation in this case to be very low. I recognize that the parties have already attempted negotiations, and encourage them to make one final attempt. If they are unable to do so, they shall propose a briefing schedule.

**Accordingly:**

- **Respondent shall file, by no later than <u>Monday, November 03, 2025</u>, an amended Rule 4(c) Report or a status report stating how he wishes to proceed.**

- **Petitioner shall file, by no later than <u>Monday, November 17, 2025</u>, a joint status report providing an update on the parties' discussions. If they have not reached agreement, Petitioner shall propose an agreed-upon briefing schedule.**

   IT IS SO ORDERED.

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master
